AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| In the Matter of the Search of | ) | | |
|---|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. | 1:17-SW-372 |
| INFORMATION ASSOCIATED WITH MULTIPLE EMAIL ADDRESSES THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE | ) ) ) | | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____July 7, 2017_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Theresa C. Buchanan_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____

/s/

Date and time issued: 6/23/17    3:10 pm

_____
*Judge's signature*

City and state:     Alexandria, Virginia     Hon. Theresa C. Buchanan, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with accounts ("**Target Accounts**"):

@GMAIL.COM
@GMAIL.COM
@GMAIL.COM
@GMAIL.COM
@GMAIL.COM
@GMAIL.COM
@GMAIL.COM
R@GMAIL.COM
@GMAIL.COM

that are stored at premises owned, maintained, controlled, or operated by Google, a company

which accepts legal process at 1600 Ampitheater Parkway, Mountain View, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Google (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f) on April 20, 2017, May 11, 2017, and May 31, 2017, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents (including attachments) of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number(s));

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

f.      For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

## II.      Information to be seized by the government

All information described above in Section I that constitutes evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. § 951 (acting as a foreign agent without notice to the Attorney General) , the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 *et seq*., and 18 U.S.C. § 1001, occurring after January 1, 2013, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.   Communications, records, documents and other files that reveal efforts by Flynn, FIG, FIG associates, or the users of the **Target Accounts** to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

b.   Communications, records, documents and other files that reveal associations between Flynn, FIG, FIG associates, or the users of the **Target Accounts** and any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

c.   Records of any funds or benefits received by or offered to Flynn, FIG, FIG associates, or the users of the **Target Accounts** by, or on behalf of, any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

d.   Communications, records, documents and other files that pertain to representations that Flynn, FIG, FIG associates, or the users of the **Target Accounts** have made to the U.S. government;

e.   Communications, records, documents and other files that reveal efforts by Flynn, FIG, FIG associates, or the users of the **Target Accounts** to mask sources of funds or income;

**f.**   Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

**g.**   Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

**h.**   The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s); and

**i.**   The identity of any person(s)—including records that help reveal the person(s)' whereabouts—who communicated with the account about any matters relating to activities conducted by Flynn, FIG, FIG associates, or the users of the **Target Accounts** on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
IINFORMATION ASSOCIATED WITH MULTIPLE EMAIL )
ADDRESSES THAT IS STORED AT PREMISES )
CONTROLLED BY GOOGLE )

JUN 2 3 2011

Case No. 1:17-SW-372

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

This warrant is sought pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 951; | Acting as a foreign agent without notice to the Attorney General; |
| 22 U.S.C. § 611 et seq. | Foreign Agents Registration Act |
| 18 U.S.C. § 1001 | False Statements |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

*Applicant's signature*

*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 06/23/2017 _____

*Judge's signature*

City and state: Alexandria, Virginia

Hon. Theresa C. Buchanan, U.S. Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br>INFORMATION ASSOCIATED WITH<br>████████@GMAIL.COM<br>██@GMAIL.COM<br>████████@GMAIL.COM<br>████P@GMAIL.COM<br>████@GMAIL.COM<br>████@GMAIL.COM<br>█@GMAIL.COM<br>██████@GMAIL.COM<br>█████@GMAIL.COM<br>THAT IS STORED AT PREMISES<br>CONTROLLED BY GOOGLE | **UNDER SEAL**<br><br>Case No. 1:17-SW-372 |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, ██████████, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with email accounts: ████████ **@gmail.com;**

████ **@gmail.com;** ██████ **@gmail.com;** ████████ **@gmail.com;**

████ **@gmail.com;** ██████ **@gmail.com;** ████ **@gmail.com;**

██████ **@gmail.com;** and ████ **@gmail.com** (hereafter the "**Target Accounts**") that

is stored at premises controlled by Google, an email provider which accepts legal process at 1600

Ampitheater Parkway, Mountain View, California. The information to be searched is described

in the following paragraphs and in Attachment A. This affidavit is made in support of an

application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to

require Google to disclose to the government copies of the information (including the content of

communications) further described in Attachment A. Upon receipt of the information described in Attachment A, government-authorized persons will review that information to locate the items described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and assigned to the Washington Field Office.  I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and I am authorized by law to conduct investigations and to make arrests for felony offenses.  I have been a Special Agent with the FBI since November 1999.  I have conducted numerous investigations involving both National Security and Criminal matters to include Espionage, Counterterrorism, Drug Trafficking, and non-Traditional Organized Crime. Prior to my position as a Special Agent with the FBI, I was an Intelligence Officer with the Defense Intelligence Agency in Washington, DC.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that MICHAEL T. FLYNN ("Flynn") and individuals working for or with Flynn and the FLYNN INTEL GROUP ("FIG") committed violations of 18 U.S.C. § 951 (acting as a foreign agent without notice to the Attorney General), the Foreign Agents Registration Act, 22 U.S.C. § 611 *et seq*, and 18 U.S.C. § 1001 (making a material false statement). There is also probable cause to search the information described in Attachment A for evidence, contraband, fruits, and/or instrumentalities of these crimes, further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  *Id.*  §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      The FBI is investigating Flynn, FIG, and persons working for or with FIG in connection with activities they conducted in the United States on behalf of foreign governments and foreign principals without having properly disclosed such relationships to the United States government.  Specifically, as discussed further below, there is probable cause to believe that, since as early as July 2016, Flynn, FIG, and persons working for or with FIG performed work on behalf of, at the direction of, and for the principal benefit of the Government of Turkey, without disclosing such relationships to the United States government. The evidence indicates there is reason to believe that Flynn, FIG, and FIG associates masked the fact that they were working at the direction and for the principal benefit of the Government of Turkey by utilizing an intermediary, Ekim Alptekin, a foreign national businessman with Turkish and Dutch passports, and his company, Inovo BV ("Inovo"), which is incorporated in the Netherlands. As described in the emails below, Flynn's and FIG's work with Inovo focused almost exclusively on Fethullah Gulen, a cleric in the United States whom the Government of Turkey blames for a failed coup attempt in that country that occurred in July 2016.

7.      Under the Foreign Agents Registration Act ("FARA"), any persons acting "at the order, request, or under the direction or control of a foreign principal" and who engages

within the United States in political activities in the interests of such foreign principal must register with the Attorney General. *See* 22 U.S.C. § 611, *et seq.* It is also against the law to willfully make a false statement of a material fact or omit a material fact in that registration statement. *See* 22 U.S.C. § 218.

8.      There are some limited exemptions to the requirement to register under FARA, such as if the foreign agent registers under the Lobbying Disclosure Act ("LDA"). The LDA exemption, however, does not apply if the foreign principal is a foreign government or if a foreign government is the principal beneficiary of the political activities. *See* 22 U.S.C. § 213; 28 C.F.R. § 5.307.

9.      There is also probable cause to believe that Flynn made material misstatements on multiple government forms with respect his work on behalf of foreign nationals, foreign entities, and foreign governments. Specifically, and as discussed further below, in 2016, Flynn failed to disclose income he received from foreign entities and associations he had with foreign individuals and entities on his Questionnaire for National Security Positions (Form SF 86). Additionally, in 2017, Flynn failed to disclose income he received from foreign entities on one of his Public Financial Disclosure Reports.

10.      In furtherance of this investigation, the FBI has obtained information through interviews, legal process issued by a grand jury in Alexandria, Virginia, and public filings of relevant documents. Through a review of this information, the FBI has learned the following information about Flynn and FIG's work with Alptekin, Inovo, the Government of Turkey, and Russian entities.

**A.      Unregistered Foreign Agents**

11.     Flynn started his own company soon after being honorably discharged from the

military in September 2014. On or about June 2015, Flynn, Bijan Rafiekian (aka Bijan Kian)

("Kian"), and              incorporated FIG in Delaware, with its principal address at 44 Canal

Center Plaza, Alexandria, Virginia.

12.     The FIG Board of Directors were Flynn, Kian, and         . Flynn was the

Chairman and CEO, Kian was the Vice Chairman, and       was the President.

i.    Turkey Seeks Gulen's Extradition from the United States

13.     Based on a review of open source material, I am aware that on or about July 15,

2016, a coup d'etat was attempted in Turkey against President Recep Tayyip Èrdogan. President

Erdogan and his administration claimed that Fethullah Gulen and his followers instigated the

attempt. Gulen lives in the United States and operates a network of charter schools.

14.     On or about July 23, 2016, the Government of Turkey formally sought Gulen's

extradition from the United States.

ii.   FIG Receives Approval from the Government of Turkey to Investigate Gulen and
      Promote Stability in Turkey

15.     On or about July 26, 2016, Kian, using         **@gmail.com**, contacted

Alptekin at         **@gmail.com** about catching up. Alptekin replied to the email that they

could speak via cell phone or another communication platform.

16.     On or about July 27, 2016, Kian emailed Alptekin at          **@gmail.com**

to discuss FIG working on a project that appeared to be for the principal benefit of the

Government of Turkey. In the email, Kian indicated that he had had a "detailed discussion" with

"MF" and that they are "are ready to engage on what needs to be done. Turkey's security and

stability is extremely important to world security. [President Erdogan] can lead the campaign

5

against Radical Islam to protect the image of Islam." Based on my knowledge of this investigation, I believe "MF" is Michael T. Flynn.

17.     Soon after these initial discussions, Alptekin engaged with high-level officials within the Government of Turkey to get approval and funding for the project. For example, on or about July 29, 2016, Alptekin, using                    **@gmail.com,** emailed Kian that he had met with "MC" in Turkey. Based on my knowledge of this investigation, I believe that MC is the Turkish Foreign Minister, Melvut Cavusoglu. According to the email, "MC' asked Alptekin to work with FIG "to formulate what kind of output we can generate on the short to mid-term as well as an indicative budget ... Ps: Needles [sic] to tell you but he asked me not to read in anyone else for the time being and keep this confidential."

18.     On or about August 8, 2016, Alptekin, using                    **@gmail.com**, emailed Flynn and Kian that he met with the Turkish Minister of Economy to discuss Alptekin and FIG's proposed work for Turkey, and that the Minister of Economy agreed to discuss the proposal with other Turkish ministers, including Turkish Prime Minster Binali Yildirim.

19.     On or about August 10, 2016, Alptekin, using                    **@gmail.com,** emailed Kian and Flynn that he had had several meetings with the Turkish Ministers of Economy and Foreign Affairs, and he (Alptekin) has "a green light to discuss confidentiality, budget and the scope of the contract."

20.     Through information gathered in this investigation, I am aware that Flynn utilized a Gmail account under the name            **@gmail.com** and that Kian emailed this account for work-related matters pertaining to Turkey. For example, on August 12, 2016, Kian copied Flynn at            **@gmail.com** on an email about FIG working on a project related to Turkey.

6

21.     On or about August 18, 2016, Kian at            @gmail.com received a memo

from a consultant about the project for Turkey. The memo is entitled "Partnership to Promote a

Prosperous and Stable Turkey."

iii.  FIG and Alptekin Agree to Provide Alptekin with 20% of Any Funds Received for the
      Turkey Project

22.     As the above-described conversations indicate, it appears that the Government of

Turkey, rather than Inovo and Alptekin, was FIG's ultimate client in connection with this

project. FIG also reached a side agreement with Alptekin at the time it signed the Inovo contract

whereby Alptekin would receive 20% of any funds FIG received from the project. Given that

Alptekin was ostensibly paying FIG from his own funds for FIG's work on the project, there is

no clear business rationale for FIG to agree to repay Alptekin 20% of the funds it received from

him in connection with the project. Thus, the below-described conversations provide additional

evidence that Alptekin was not in fact FIG's client on the project.

23.     On or about August 11, 2016, Kian informed Alptekin that he and Flynn had

discussed the "campaign," which they described as restoring "confidence through clarity," and

that the budget included providing Alptekin 20% of the fees for "advisory support."

24.     On or about August 25, 2016, Kian sent an email indicating that Alptekin's

company, Inovo, would be the official client for FIG's project related to Turkey. Specifically,

Kian emailed Alptekin at            @gmail.com, and copied Flynn, to thank Alptekin for

engaging FIG on "Operation CONFIDENCE." In the email, Kian explained that the budget

would be up to $200,000 per month, 20% of which would be provided to Inovo for Alptekin's

"active participation and counsel on this engagement."

7

25.    On or about September 3, 2016, Kian emailed Alptekin at

@gmail.com, and copied Flynn, attaching an agreement between Inovo and FIG.

Kian stated to Alptekin that "we have been at work on this engagement since July 31st."

26.    On or about September 8, 2016, Alptekin, using                    @gmail.com,

emailed Kian an Independent Advisory Services Agreement signed by Alptekin. In the

agreement, Inovo is listed as the "client;" FIG is the "advisor." The agreement states that the

advisor, FIG, "is prepared to deliver findings and results including but not limited to making

criminal referrals if warranted." Based on my knowledge of this investigation, I believe

"criminal referrals" refers to referrals to U.S. law enforcement authorities regarding criminal

activity by Gulen. The agreement is effective on August 15, 2016, and continues for three

months. The compensation for the "advisor," FIG, is $200,000 per month.

27.    On or about September 9, 2016, the day after email records indicate Flynn and

Alptekin had both signed the Independent Advisory Services Agreement, bank records indicate

that Alptekin transferred $200,000 to FIG.

28.    On or about September 12, 2016, Kian emailed Flynn

                                another Independent Advisory Services Agreement for

Alptekin. In this second agreement, in a reversal of roles from the contract signed on September

8, Alptekin is listed as the "advisor" and FIG is the "client." The agreement includes a

"mobilization fee" of $40,000 for the advisor, Alptekin. The agreement was later modified to

state the Alptekin was performing those services under Inovo, and signed by Flynn on October

30, 2016.

29.    According to bank records provided by FIG, on or about September 13, 2016,

four days after receiving $200,000 from Alptekin, FIG transferred $40,000 to Inovo.

8

30.     On or about October 7, 2016, Kian emailed Alptekin at

████████**@gmail.com** an invoice for $200,000 for the "Confidence Project."

31.     On or about October 11, 2016, according to FIG bank records, Alptekin transferred $185,000 to FIG.

32.     On or about October 13, 2016, Kian emailed Flynn████████████ and Alptekin (using ████████ **@gmail.com**), requesting that ████████ wire transfer $40,000 from FIG to Inovo "as soon as Mr. Alptekin sends us an invoice for consulting services that he is providing to FIG on the Confidence project."

33.     On or about October 17, 2016, six days after Alptekin transferred $185,000 to FIG, FIG wire transferred $40,000 to Inovo for work associated with the "Confidence Project."

34.     On or about November 10, 2016, Kian emailed Alptekin at

████████**@gmail.com** a third invoice for the "Confidence Project." In the email, Kian advised that Inovo was owed $55,000 for "research and consultation services," and requested an invoice to that affect from Alptekin. The attachment with this email is an invoice from FIG to Alptekin for $200,000.

35.     On or about November 14, 2016, according to FIG bank records, Alptekin transferred $145,000 to FIG. Based on the previous email, I believe that Alptekin deducted $55,000 from the scheduled $200,000 payment to FIG to arrive at a payment of $145,000.

36.     According to the email records obtained from FIG, Alptekin does not appear to have provided any advisory, research, or consultation services to FIG during September and October 2016.

   iv. FIG's Work Exclusively Focused on Gulen and Promoting Stability in Turkey

9

37.     As the above-described conversations indicate, it appears that the Government of Turkey, rather than Inovo and Alptekin, was FIG's ultimate client in connection with this project. Further support for this conclusion can be found within FIG's emails about the project, which indicate that FIG's work pursuant to the contract focused exclusively on Gulen – whose extradition the Government of Turkey was expending substantial resources in order to secure at this time – and promoting stability in Turkey, both of which are core interests of the Government of Turkey, rather than of the Dutch company Inovo.

38.     On or about September 5, 2015 Kian emailed Flynn about the "Operation CONFIDENCE Playbook." The "Playbook," which was attached to the email, described its mission goals as investigating the activities of "X" in the United States and registering "under Lobbying Disclosure Act representing a Dutch entity." Based on my review of the materials obtained in this investigation, I believe "X" refers to Gulen. Listed among the participants in the "Playbook" is Ekim Alptekin, whose role is defined as "strategy support," as opposed to the "client" or a similar moniker.

39.     On or about September 6, 2016, Kian emailed                    Flynn, and advised that the "client is seeking a high level meeting in NYC on September 19th or 20th."

40.     On or about September 18, 2016, Kian emailed Flynn what appeared to be background material and talking points for a planned meeting in New York the following day. The attachment included a series of questions regarding Gulen and drew comparisons between Gulen and the late Ayatollah Khomeini of Iran.

41.     On or about September 19, 2016, according to publicly filed documents and interviews conducted by the FBI, Kian, Flynn, Brian McCauley, and James Woolsey, the former Director of Central Intelligence, met with Alptekin, Turkish Minister of Foreign Affairs

10

Cavusoglu, and the Turkish Minister of Energy, Berat Albayrak. According to open source information, Minister Albayrak is the son-in-law of President Erdogan. According to one of the meeting participants, the individuals discussed forcibly removing Gulen from the United States.

42.     On or about September 21, 2016, Kian emailed Flynn and advised that he had met with Alptekin and that the feedback from the earlier meeting was "positive." Nevertheless, Kian was concerned about expectations that Alptekin had shared, and indicated that he would find out "what caused the elevated expectation on their side tomorrow." (Emphasis added).

43.     On or about September 26, 2016, Alptekin, using            **@gmail.com**, emailed Kian and wrote that "Ali" would connect Kian with an attorney investigating Gulen and "the Turkish delegation." I believe that Ali is a reference to            , whom FIG identified to the FBI as one of its third-party vendors. Kian and other persons working with FIG exchanged emails with     at     **@gmail.com** to ask     for assistance with its work with Inovo. For example, on or about October 11, 2016,     exchanged emails with Michael Boston, a FIG associate, about Gulen-operated schools in Ohio.

44.     On or about October 21, 2016, Kian emailed Alptekin at

**@gmail.com** copies of proposed board games for Project Confidence entitled "Gulenopoly" and "Mula Mullah." Because Gulen is a religious cleric, and the term "mullah" is sometimes used to refer to Muslim clerics, I believe the titles of both board games contain references to Gulen. In the email, Kian opines that Gulen is destabilizing Turkey.

45.     On or about November 8, 2016, Flynn published an op-ed in *The Hill* focusing on Gulen, whom Flynn called a "radical Islamist." Flynn also called Turkey the US's strongest ally against ISIS. Four days earlier, Kian emailed a version of that op-ed to Alptekin at

**@gmail.com**.

11

v. Multiple Persons Worked with FIG on its Project for the Government of Turkey

46.    According to public filings, FIG contracted with Sphere Consulting to assist with FIG's work with Inovo. One of the individuals at Sphere with whom Kian communicated was Graham Miller, who utilized              **@gmail.com** for some of this work. For example, on or about October 21, 2016, Kian emailed Miller at              **@gmail.com** multiple attachments related to the Project Confidence and Gulen. Miller received at least three other emails at              **@gmail.com** from individuals working for FIG about the project, including a brief to provide the client.

47.    Based on a review of emails from FIG, there are multiple instances in which Brian McCauley, a FIG associate who led FIG's investigation of Gulen, utilized

**@gmail.com for** part of his work for FIG. For example, on or about September 16, 2016, Kian copied McCauley at              **@gmail.com** on an email regarding a scheduled meeting with a member of Congress.

48.    On or about October 11, 2016, McCauley, using              **@gmail.com**, emailed Michael Boston asking for a particular form and a contract for individuals working on the investigation.

49.    Between October 4 and October 18, 2016, Michael Boston sent multiple emails to McCauley at              **@gmail.com** about the Gulen investigation.

50.    In addition to the above emails, Kian emailed McCauley at

**@gmail.com** in relation to FIG's work with Inovo. On or about November 1, 2016, Kian emailed McCauley at              **@gmail.com,**              (a FIG associate), and other FIG personnel regarding an attachment in the email that could be of interest to "the client." The attachment appeared to be a photograph of a hotel guest book signed by Erdogan.

12

51.    On or about November 18, 2016, McCauley, using ▮▮▮▮▮▮▮ **@gmail.com**,

emailed Kian and copied two other email accounts: ▮▮▮▮▮▮ **@gmail.com** and

▮▮▮▮▮▮▮ **@gmail.com**. The email concerned work McCauley performed for FIG and he

attached an invoice under the name McCauley Consulting at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮,

▮▮▮▮▮▮▮. An open source review of Creed Security Group reflected the same physical

address in ▮▮▮▮▮▮▮▮▮. Based on this information, I believe that

▮▮▮▮▮▮@gmail.com is used by Brian McCauley. Later that day, McCauley sent two

more emails with invoices to Kian, and copied the same email accounts as the first

communication.

52.    ▮▮▮▮▮▮ also utilized a Gmail account to communicate with FIG associates

relating FIG's work with Inovo. On or about November 18, 2016, Kian emailed ▮ at

▮▮▮▮▮▮ **@gmail.com** and asked him to look at a statement FIG was going to issue

regarding its relationship with Inovo. Based on my review of FIG's documents, I believe this

statement was drafted in response to an article in November 2016 publicizing the relationship

between FIG and Inovo.

vi. FIG Makes Material False Statements and Omits Material Facts on its FARA Filing

53.    On or about September 30, 2016, according to public records, FIG registered

under the LDA that it was engaged in lobbying activity on behalf of Inovo. The filing, however,

failed to identify that the Government of Turkey directed, controlled, or was the principal

beneficiary of FIG's lobbying activity. Moreover, the filing failed to specify that FIG would be

lobbying on issues relating to Turkey and Gulen.

54.    After receiving a letter from the U.S. Department of Justice, on or about March 7,

2017, over six months after it began working with Alptekin, FIG registered under FARA with

respect to its work with Inovo. In its registration, FIG acknowledged that its work "could be construed to have principally benefitted the Republic of Turkey." The filing, however, appeared to contain multiple material false statements, including that the Government of Turkey did not direct, control, or finance FIG's work with Inovo; that FIG did not know the extent of Government of Turkey's involvement in the project; that the purpose of the project was business-related; and that project was related to Inovo's work for an Israeli company.

55.     Following the public revelation of Inovo's relationship with FIG, Alptekin publicly denied that he worked on behalf of the Government of Turkey in his dealing with FIG. Kian made similar denials in emails to Alptekin.

56.     When certain media outlets reported about $80,000 of payments from FIG to Alptekin listed in FIG's FARA filing as "Consultant Fees," Alptekin publicly claimed that those payments were refunds for lobbying work that FIG had not performed. However, as detailed above, as early as August 11, 2016, Alptekin and Kian discussed providing Alptekin with 20% of the contract for "advisory support."

**B.      Other Material False Statements**

57.     In addition to failing to properly disclose to the United States government his and FIG's work with the Government of Turkey, Flynn appears to have made material misstatements on multiple government forms with respect his work on behalf of other foreign nationals, foreign entities, and foreign governments.

58.     On or about December 10, 2015, Flynn traveled to Moscow, Russia, to speak at an event for RT, a media organization with ties to the Government of Russia. According to records from the company who helped arrange Flynn's participation, Flynn was paid $33,750 to attend

and speak at the event. Open source reporting indicates that at the event Flynn sat at the same table as Russian President Vladimir Putin.

59.    On or about January 21, 2016, Flynn submitted and electronically signed an SF-86 for the Defense Intelligence Agency ("DIA"), in order to maintain his security clearance. On the SF-86, and in subsequent representations to the DIA, Flynn did not disclose that he had received $33,750 from RT.  On or about February 11, 2016, in an interview with a background investigator for his security clearance, Flynn acknowledged traveling to Russia to speak at a conference for the Russian media, but he did not disclose to the interviewer that he was paid $33,750 for his work.

60.    On or about August 19, 2015, Flynn spoke at an event in Washington, DC, for which he was paid $11,250 by Volga Dnepr Airlines. Flynn's participation in the event was booked through the speaking firm Leading Authorities Inc.  According to open source information, Volga Dnepr Airlines is based in Ulanovsk, Russia, and specializes in air charter services. The event at which Flynn spoke was a Middle East & African Logistical Security Conference.

61.    On or about October 20, 2015, Flynn was a keynote speaker for Eugene Kaspersky's Government Cybersecurity Forum in Washington, DC, for which he was paid $11,250.  According to open source information, Kaspersky is a Russian national and Chairman and CEO of Kaspersky Labs. Additional open source research reflects that Kaspersky was educated at a KGB-sponsored cryptography institute.

62.    On or about February 11, 2017, pursuant to his selection as National Security Advisor, Flynn submitted and electronically signed a Public Financial Disclosure Report for the U.S. Office of Government Ethics. On that report, Flynn did not disclose his speaking

engagements with, and payments received from, Volga-Dnepr Airlines and Kaspersky Government Solutions.

63.     On or about March 31, 2017, after Flynn resigned as National Security Advisor and extensive public reporting about his work for foreign principals and entities, Flynn filed a second Public Financial Disclosure Report, which disclosed his paid work for RT, Volga-Dnepr Airlines, and Kaspersky Government Solutions.

## BACKGROUND CONCERNING EMAIL

64.     In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public.  Google allows subscribers to obtain email accounts at the domain name gmail.com, like the email account listed in Attachment A.  Subscribers obtain an account by registering with Google.  During the registration process, Google asks subscribers to provide basic personal information.  Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

65.     A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

66.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number(s)). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

67.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

68.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically

17

retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

69.     This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.[1]

70.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled

---

[1] It is possible that Google stores some portion of the information sought outside of the United States. In <u>Microsoft Corp. v. United States</u>, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information—including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Google. The government also seeks the disclosure of the physical location or locations where the information is stored.

the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crimes under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

71.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

72.    I further request that the Court order that all papers in support of this application,

including the application, affidavit and search warrant, be sealed until further order of the Court.

These documents discuss an ongoing criminal investigation that is neither public nor known to

all of the targets of the investigation.  Accordingly, there is good cause to seal these documents

because their premature disclosure may give targets an opportunity to flee/continue flight from

prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates,

or otherwise seriously jeopardize the investigation.


Respectfully submitted,


Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on this $\overset{\curvearrowright}{23}$    day of June, 2017.



The Honorable Theresa C. Buchanan
United States Magistrate Judge

20