AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT
for the
District of Columbia

AUG 25 2017

Clerk, U.S. District and
Bankruptcy Courts

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
EMAIL ACCOUNTS AND TEN ELECTRONIC DEVICES
CURRENTLY LOCATED AT THE FBI WASHINGTON
FIELD OFFICE

Case: 1:17-mj-00633
Assigned To : Howell, Beryl A.
Assign. Date : 8/25/2017
Description: Search & Seizure Warrant

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of ___Columbia___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 953 | Private correspondence with foreign governments |
| 18 U.S.C. § 1001 | False Statements |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:
[redacted]

_____
*Applicant's signature*

[redacted]
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 08/24/2017

_____
*Judge's signature*

City and state: Washington, D.C.

Hon. James E. Boasberg, U.S. District Judge
*Printed name and title*

FILED
AUG 25 2017
Clerk, U.S. District and
Bankruptcy Courts

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
EMAIL ACCOUNTS
█████@PTT.GOV,
█████@PTT.GOV,
AND █████@PTT.GOV;
AND TEN ELECTRONIC DEVICES
CURRENTLY LOCATED AT THE FBI
WASHINGTON FIELD OFFICE, 601 4TH
STREET NW, WASHINGTON, D.C. 20535

Case: 1:17-mj-00633
Assigned To : Howell, Beryl A.
Assign. Date : 8/25/2017
Description: Search & Seizure Warrant

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, █████████████, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – namely, email accounts and electronic devices, described in Attachment A – currently in the possession of the Federal Bureau of Investigation (FBI), and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the FBI, assigned to the Washington Field Office and working directly with the Special Counsel's Office. I am a law enforcement officer of the United States and I am authorized by law to conduct investigations and make arrests for felony offenses. I have been a Special Agent with the FBI since June 2004. I have conducted numerous investigations involving both criminal and national security matters to include violent crime and espionage matters. I have training and experience related to foreign intelligence service activities, national security investigations, and espionage investigations.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4. This application seeks to search email accounts ▮▮▮@ptt.gov ("**Target Account 1**"), ▮▮▮@ptt.gov ("**Target Account 2**"), and ▮▮▮@ptt.gov ("**Target Account 3**") (collectively, the "**Target Email Accounts**"); as well as cellular telephones with serial numbers ▮▮▮ ▮▮▮ and laptop computers with Dell "service tag" numbers ▮▮▮ (collectively, the "**Target Devices**").

5. As described below, each of the **Target Email Accounts** and **Target Devices** was provided by the General Services Administration (GSA) to one of three members of then-President Elect Donald J. Trump's transition team after the 2016 presidential election: MICHAEL T. FLYNN, Kathleen T. McFarland, and ▮▮▮. At the FBI's request, the GSA provided the **Target Email Accounts** and **Target Devices** to the FBI, which is maintaining them at the FBI's Washington Field Office located at 601 4th Street NW, Washington, D.C., 20535. While the FBI might already have all necessary authority to examine the property, I seek this additional warrant out of an abundance of caution to be certain that an examination of the property will comply with the Fourth Amendment and other laws. Because the property to be searched is located in the District of Columbia, this Court has jurisdiction to issue a search and seizure warrant. *See* Fed. R. Crim. P. 41(b)(1).

## PROBABLE CAUSE

6. I am familiar with the facts and circumstances of this investigation through my personal participation in the investigation as well as my review of:

   a. Oral and written reports about this and prior investigations from special agents of the FBI;

   b. A review of header information for electronic communications (obtained pursuant to an order of this Court under 18 U.S.C. § 2703(d)) made or received by the **Target Email Accounts**—that is, information – not including the contents of communications – about each communication sent or received by the account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses and Internet Protocol ("IP") addresses);

   c. A review of search warrant information;

   d. A review of subpoena information, including toll records and subscriber information for telephone numbers; and

   e. A review of databases and Internet sites containing publicly available records and information, such as media reports and business information.

### Relevant Individuals

7. According to public source information, MICHAEL T. FLYNN was the Director of the Defense Intelligence Agency from July 2012 to August 2014. In 2015, FLYNN started the Flynn Intel Group ("FIG"), and was its Chief Executive Officer and Chairman. FLYNN was a surrogate for Donald. J. Trump's 2016 presidential campaign (the "Campaign"). Following the election, on November 18, 2016, FLYNN accepted then-President Elect Donald J. Trump's offer

3

to become National Security Advisor. On February 13, 2017, FLYNN resigned as National Security Advisor. FLYNN currently resides in the United States and has maintained U.S. citizenship during the time period covered by this search warrant application (November 2016 to the present).

8. Based on public source information and records obtained in the course of the investigation, Kathleen T. ("K.T.") McFarland was a national security analyst for Fox News during the Campaign. Following the Campaign, on or about November 25, 2016, McFarland was announced as Deputy National Security Advisor.

9. According to public source information, ▮▮▮▮▮ worked on the Campaign. Records obtained in the course of the investigation indicate that ▮▮▮▮▮ served on the President-Elect's transition team and served as an aide and scheduler to FLYNN and McFarland during the transition period.

**The Target Email Accounts and Target Devices**

10. Based on communications with and records obtained from the GSA, I know that after the 2016 presidential election, the GSA issued cellular telephones, laptop computers, and email accounts to members of the President-Elect's transition team for use during the period of the transition, which lasted from on or about the day after the election, November 9, 2016, until on or about the date of the inauguration, January 20, 2017.

11. Based on information provided by the GSA, FLYNN was assigned **Target Account 1** as his email account; McFarland was assigned **Target Account 2**, and Gelbinovich was assigned **Target Account 3**. FLYNN, McFarland, and ▮▮▮▮▮ also were assigned the following cellular phones and laptop computers (the **Target Devices**):

4

a. FLYNN was assigned cellular telephones with the following phone numbers and serial numbers:

   i. ▮▮▮▮▮▮▮▮), serial number ▮▮▮▮▮▮▮▮

   ii. ▮▮▮▮▮▮▮▮ serial number ▮▮▮▮▮▮▮▮

   iii. ▮▮▮▮▮▮▮▮, serial number ▮▮▮▮▮▮▮▮

b. McFarland was assigned a cellular telephone with phone number ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

c. ▮▮▮▮▮ was assigned a cellular telephone with phone number ▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

d. FLYNN was assigned laptops with the following Dell service tag numbers:

   i. ▮▮▮▮

   ii. ▮▮▮▮

   iii. ▮▮▮▮.

e. McFarland was assigned a laptop with Dell service tag number ▮▮▮▮

f. ▮▮▮▮▮ was assigned a laptop with Dell service tag number ▮▮▮▮

12. Based on information provided by the GSA, when email accounts and electronic devices, including the **Target Email Accounts** and **Target Devices**, were issued to members of the transition team, recipients were required to certify that the "Government property" they had received was being provided "in connection with [their] role with the President-elect/Eligible Candidate Transition Team"; that it needed to be returned when they were no longer working for the transition team; and that they agreed to abide by the IT Acceptable Use Policy. In addition, the laptop computers issued by GSA to members of the transition team included a visible banner upon turning on the computers that stated: "This is a U.S. General Services Administration



Federal Government computer system that is FOR OFFICIAL USE ONLY. By accessing and using this computer you are agreeing to abide by the PTT General IT Rules and Behavior and are consenting to monitoring, recording, auditing and information retrieval for law enforcement and other purposes. Therefore, no expectation of privacy is to be assumed."

**The Investigation**

13. The FBI is investigating whether FLYNN corresponded with foreign government officials without the authority of the United States, with intent to influence the conduct of foreign governments, in violation of 18 U.S.C § 953, and whether FLYNN made materially false statements and omitted material facts to the FBI regarding his communications with those foreign government officials, in violation of 18 U.S.C. § 1001.

14. As part of the investigation, the government has obtained certain emails pursuant to grand jury subpoenas. In one such email, date and time stamped Tuesday, December 6, 2016, at 4:48 p.m., ▮▮▮▮▮▮▮▮, an individual working at the Russian Embassy, sent FLYNN an email at ▮▮▮▮@flynnintelgroup.com that stated: "Dear Mr. Flynn, Ambassador would like to have a follow up conversation on the matters he discussed with you in New York. Is there a direct telephone number where he could reach you?" The email signature block identified ▮▮▮▮ as "Congressional liaison, Embassy of Russia to the USA, ▮▮▮▮."

15. On the same date and time, indicating a possible automatic reply, a return email from ▮▮▮▮@flynnintelgroup.com to ▮▮▮▮@gmail.com stated that the email account had been suspended, that FLYNN's new email address was **Target Account 1**, and that "[o]ther points of contact for FLYNN were: "▮▮▮▮▮▮▮▮ ([**Target Account 3**])" and "▮▮▮▮▮▮▮▮▮▮▮▮▮▮)." I know based on my involvement in the investigation that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, who also had a role on the transition team.

6

16. Pursuant to an order of this Court under 18 U.S.C. § 2703(d) (the "2703(d) Order"), the government obtained email header information, without content, for the **Target Email Accounts**. Based on the email header information obtained pursuant to the 2703(d) Order, on December 6, 2016, at 5:23 p.m. – approximately 35 minutes after the above emails were sent – ▮@gmail.com sent FLYNN an email to **Target Account 1**. On Wednesday, December 07, 2016, ▮@gmail.com sent FLYNN three additional emails to **Target Account 1** at 8:57 a.m., 10:15 a.m. and 11:08 a.m.

17. Based on travel, phone, and bank records, I know that from on or around December 25, 2016, to on or around December 30, 2016, FLYNN was in the Dominican Republic. For example, statements for a Merrill Lynch account held in the name of Michael T. FLYNN and ▮ included transaction activity associated with a "Visa Access" card. On or around December 26, 2016, and again on or around December 30, 2016, charges were incurred on this card with a description including a reference to "Inversiones El Laurel," which is a hotel and resort in the Dominican Republic.

18. Based on a review of open source material, on December 28, 2016, then-President Barack Obama signed Executive Order 13757, which was to take effect on December 29, 2016 at 12:01 a.m. Executive Order 13757 announced sanctions against the Russian government in response to the Russian government's efforts to interfere with the 2016 presidential election. At approximately 11:24 a.m., the Obama administration, using Twitter handle @ObamaWhiteHouse, posted a link to a statement by then-President Obama titled, "Statement by the President on Actions in Response to Russian Malicious Cyber Activity and Harassment." The announcement stated that the sanctions were in retaliation for "Significant Malicious Cyber-Enabled Activities" engaged in by Russia during the presidential election, and imposed

economic sanctions on four Russian individuals and five Russian entities. The administration also ordered 35 Russian diplomats to leave the country and the closure of two Russian compounds in the Washington, D.C. area. The sanctions prompted vows from the Russian government that it would respond in kind, as described in more detail below.

19. Based on toll records, on December 29, 2016, at approximately 2:29 p.m., McFarland, using her GSA-issued cellular telephone ▮, called the number ▮. Records obtained in the investigation indicate that the ▮ number was FLYNN's personal cell phone. For example, emails obtained pursuant to a judicially-authorized search warrant show that on or about December 19, 2016, ▮ provided the ▮ number as the personal cell phone for FLYNN and noted that it was "very close hold." From July 9, 2016 to December 19, 2016, the ▮ number was subscribed to by FLYNN's company, FIG. From December 19, 2016 to January 29, 2017, the number was subscribed to by ▮, ▮.

20. According to toll records, on December 29, 2016, at approximately 3:50 p.m., McFarland again called FLYNN (at the ▮ number), and the call lasted for approximately six minutes and thirty-nine seconds. Minutes after that call, at approximately 4:01 p.m., the telephone number ▮, which was subscribed to by "Inversiones El Laurel," with a "site address" of "Excellence Punta Cana Resort" in the Dominican Republic, called McFarland for approximately 11 minutes. At approximately 4:20 p.m., the Excellence Resort telephone number called ▮ for approximately 10 minutes. I know based on public sources that a telephone number for the Russian Embassy in Washington, D.C. is ▮. At approximately 6:07 p.m. that evening, McFarland called FLYNN's number ▮ for

8

approximately 6 seconds, and then at 6:08pm, McFarland was in contact with FLYNN's number ▮▮▮▮ for approximately 27 minutes.

21. Email header information obtained pursuant to the 2703(d) Order shows that on December 29, 2016, at 11:49 a.m. and 1:56 p.m., **Target Account 2** (issued to McFarland) sent emails to **Target Account 1** (issued to FLYNN), along with three other members of the transition team. Later that day, at 4:43 p.m., **Target Account 2** sent an email to **Target Account 1** and six other members of the transition team. One minute later, at 4:44 p.m., **Target Account 2** sent an email to **Target Account 1** and two other members of the transition team. At 6:05 p.m., **Target Account 2** sent an email to **Target Account 3** and to one other addressee. At 10:05 p.m., **Target Account 2** sent another email to **Target Account 3**. At 10:06 p.m., **Target Account 3** sent an email to **Target Account 2**.

22. On December 30, 2016, at approximately 5:32 a.m., a statement was released by Sergey Lavrov, the Russian Foreign Minister, on the mid.ru website, which is a website used by the Ministry of Foreign Affairs of the Russian Federation for the release of public statements. Lavrov stated that in response to the sanctions imposed the previous day by the Obama administration, "We will definitely respond to these actions. Reciprocity is a basic tenet of international diplomacy and international relations. Therefore, the Russian Foreign Ministry and colleagues from other agencies have submitted a proposal to the President of Russia to declare 'persona non grata' 31 diplomats from the US Embassy in Moscow and four diplomats from the US Consulate General in St Petersburg."

23. On December 30, 2016, at approximately 7:15 a.m., a statement was released by Vladimir Putin, the President of Russia, on the kremlin.ru website, which is a website used by Putin for the release of public statements. In response to the sanctions imposed by the Obama

9

administration, Putin stated: "Leaving the right for retaliatory measures, we will not go down to the level of 'kitchen', irresponsible diplomacy and further steps for restoring Russian-American relations will be built on the basis of the policy that Presidential Administration D. Trump will conduct." Based on information obtained pursuant to the 2703(d) Order, at 7:29 a.m. on December 30, 2016 – approximately 14 minutes after Putin's statement was released – **Target Account 2** emailed **Target Account 1** and two other members of the transition team.

24. On December 30, 2016, at approximately 11:41 a.m., the Twitter handle for President-Elect Donald Trump, @realDonaldTrump, tweeted: "Great move on delay (by V. Putin) - I always knew he was very smart!"

25. Email header information obtained pursuant to the 2703(d) Order shows that on December 30, 2016, at approximately 12:33 p.m., **Target Account 3** emailed **Target Account 2** and **Target Account 1**. At approximately 5:22 p.m., ▇▇▇@gmail.com (which, as noted above, is an email account used by ▇▇▇, congressional liaison for the Russian Embassy) emailed **Target Account 3**. At approximately 6:59 p.m., **Target Account 3** emailed **Target Account 1** and another member of the transition team. Also on December 30, 2016, I know based on toll records that McFarland, using her GSA-issued cellular telephone ▇▇▇ exchanged multiple text messages with FLYNN ▇▇▇

26. According to toll records, on December 31, 2016 at approximately 2:14 p.m., FLYNN's number ▇▇▇ received a call, approximately 5 minutes in duration, from the number ▇▇▇, which is subscribed to by the Russian Embassy in Washington, D.C. Also on December 31, 2016, email header information obtained pursuant to the 2703(d) Order shows that at approximately 4:33 p.m., **Target Account 1** emailed **Target Account 2**, **Target Account 3**, and two other members of the transition team. Toll records further show that at

10

approximately 4:43 p.m. on December 31, 2016, FLYNN spoke by phone with McFarland, using her GSA-issued cellular telephone ████, and that FLYNN and McFarland subsequently exchanged several text messages.

27.     Emails obtained pursuant to a judicially-authorized search warrant show that on or about January 6, 2017, a member of the Trump campaign team on foreign policy issues e-mailed **Target Account 1** and advised that a foreign government official had been asking to meet with FLYNN. Later that day, FLYNN responded to the Trump campaign member: "We'll reach out and try to meet this coming week." FLYNN's response was also sent to **Target Account 3** and **Target Account 2**.

28.     Based on a review of open source material, on January 15, 2017, Vice President-Elect Mike Pence appeared on CBS's Face the Nation. During the interview, Pence was asked by John Dickerson about whether FLYNN had been "in touch with the Russian ambassador on the day the United States government announced sanctions for Russian interference with the election [December 29, 2016]." Pence stated that he had "talked to General Flynn about that conversation" and that FLYNN and Russian Ambassador Kislyak "did not discuss anything having to do with the United States' decision to expel diplomats or impose censure against Russian." Dickerson then asked: "So did they [FLYNN and Kislyak] ever have a conversation about sanctions ever on those days or any other day?" Pence responded: "… I can confirm, having spoken to him (FLYNN) about it, is that those conversations that happened to occur around the time that the United States took action to expel diplomats had nothing whatsoever to do with those sanctions."

29.     Based on a review of open source material, on February 13, 2017, FLYNN resigned as National Security Advisor. In his letter of resignation, FLYNN stated: "I

11

inadvertently briefed the Vice President Elect and others with incomplete information regarding my phone calls with the Russian Ambassador."

30. Based on a review of open source material, on February 14, 2017, Press Secretary Sean Spicer held a regularly scheduled press briefing. At the briefing, Spicer stated: "I want to address the events of last night first and foremost. We've been reviewing and evaluating this issue with respect to General Flynn on a daily basis for a few weeks, trying to ascertain the truth. We got to a point not based on a legal issue, but based on a trust issue, where a level of trust between the President and General Flynn had eroded to the point where he felt he had to make a change. The President was very concerned that General Flynn had misled the Vice President and others."

31. Based on a review of open source material, on February 16, 2017, President Trump held a press conference during which he stated: "Mike Flynn is a fine person, and I asked for his resignation. He respectfully gave it. He is a man who there was a certain amount of information given to Vice President Pence, who is with us today. And I was not happy with the way that information was given. He didn't have to do that, because what he did wasn't wrong – what he did in terms of the information he saw." In response to a subsequent question, President Trump further stated: "[FLYNN] did something wrong with respect to the vice president and I thought that was not acceptable."

32. On May 8, 2017, Sally Yates, who was the Acting Attorney General from approximately January 20, 2017 until January 30, 2017, testified before the Senate Judiciary Subcommittee on Crime and Terrorism. During her testimony, Yates stated that she had met with White House Counsel Don McGahn on January 26 and January 27, 2017 to discuss "a very sensitive matter," and that she began her meeting with McGahn by "telling him that there had

12

been press accounts of statements from the vice president and others that related conduct that Mr. Flynn had been involved in that we knew not to be the truth." In response to a question from Senator Lindsey Graham, Yates further testified: "We also told the White House Counsel [Don McGahn] that General Flynn had been interviewed by the FBI . . . . Mr. McGahn asked me how he did and I declined to give him an answer to that. And we then walked through with Mr. McGahn essentially why we were telling them about this and the first thing we did was to explain to Mr. McGahn that the underlying conduct that General Flynn had engaged in was problematic in and of itself."

33. Based on a review of open source material, on February 20, 2017, Vice President Pence told reporters at a joint news conference with the head of the North Atlantic Treaty Organization in Brussels, "I was disappointed to learn that the facts that had been conveyed to me by Gen. Flynn were inaccurate."

**Electronic Storage and Forensic Analysis**

34. I know based on my training and experience that a wireless or cellular telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the

Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

35. Based on my knowledge, training and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

36. Information provided by the GSA indicates that the Target Devices were "wiped" after they were returned to the GSA following the transition period. Nevertheless, based on my knowledge, training, and experience, there is probable cause to believe that things that were once stored on the Target Devices may still be there, or may be recoverable, for at least the following reasons:

    a. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overridden by new data.

    b. Therefore, deleted files or remnants of deleted files may reside in free space or slack space – that is, space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

37. Manner of execution. Because this warrant seeks only permission to examine accounts and devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

38. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Email Accounts** and **Target Devices**, identified in Attachment A, to seek the items described in Attachment B.

## REQUEST FOR SEALING

39. I further request that the Court order that all papers in support of this application, including the application, affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

███████████████

Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 24th day of August, 2017.

_____
The Honorable James E. Boasberg
United States District Judge

## ATTACHMENT A

**Property to Be Searched – the Target Email Accounts and Target Devices**

This warrant applies to information contained in the following accounts and property, which is in the possession of the FBI:

1. Email accounts provided by the GSA with account names:
   a. ▮@ptt.gov
   b. ▮@ptt.gov
   c. ▮@ptt.gov

2. Cellular telephones provided by GSA with serial numbers:
   a. ▮ (assigned to Michael T. Flynn)
   b. ▮ (assigned to Michael T. Flynn)
   c. ▮ (assigned to Michael T. Flynn)
   d. ▮ (assigned to Kathleen T. McFarland)
   e. ▮ (assigned to ▮)

3. Laptop computers provided by GSA with Dell laptop service tag numbers:
   a. ▮ (assigned to Michael T. Flynn)
   b. ▮ (assigned to Michael T. Flynn)
   c. ▮ (assigned to Michael T. Flynn)
   d. ▮ (assigned to Kathleen T. McFarland)
   e. ▮ (assigned to ▮)

17

## ATTACHMENT B

### Information to be Seized

Any and all records in the **Target Email Accounts** and **Target Devices** (described in Attachment A) which consist of evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 953 (private correspondence with foreign governments) and/or 18 U.S.C. § 1001 (making a false statement), for the period November 2016 to the present, including:

a. All records, information, documents or tangible materials that relate in any way to communications with foreign government officials or agents of a foreign power, or discussions with others regarding those actions, or plans or attempts at undertaking such actions, or discussions of meetings with the FBI or investigations being conducted by the FBI;

b. All images, messages, communications, calendar entries, search terms, and contacts, including any and all preparatory steps taken in furtherance of the above-listed offenses;

c. Communication, information, documentation and records relating to who created, used, or communicated using any account on the devices or within the accounts, including records about their identities and whereabouts;

d. Evidence of the times the accounts or devices were used;

e. All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

f. All address books or other lists of contacts;

g. All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

h. Passwords and encryption keys, and other access information that may be necessary to access the account and other associated accounts;

i. Any information recording the schedule of or travel by Michael T. Flynn, Kathleen T. McFarland or ▬▬▬▬▬ from January 1, 2016 to the present; and

j. Evidence of user attribution showing who used the account or device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

18