AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

FILED

SEP 2 7 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
EMAIL ACCOUNTS ▮▮▮▮▮@PTT.GOV,
▮▮▮▮▮@PTT.GOV,         ▮▮▮▮▮@PTT.GOV,
▮▮▮▮▮@PTT.GOV,          ▮▮▮▮▮@PTT.GOV, AND
TEN ELECTRONIC DEVICES CURRENTLY LOCATED AT FBI WASHINGTON
FIELD OFFICE, 601 4TH STREET NW, WASHINGTON, D.C. 20535

)
)
)
)
)
)

Case: 1:17-mj-00686
Assigned To : Howell, Beryl A.
Assign. Date : 9/26/2017
Description: Search & Seizure Warrant

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 953; | Private correspondence with foreign governments |
| 18 U.S.C. § 1001 | Making a material false statement |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

▮▮▮▮▮▮▮▮▮▮▮▮

*Applicant's signature*

*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/27/2017 at 10:12 A.M.

*Judge's signature*

City and state:  Washington, D.C.

Hon. Beryl A. Howell, Chief U.S. District Judge
*Printed name and title*

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SEP 2 7 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE MATTER OF THE SEARCH OF
EMAIL ACCOUNTS
████████████G@PTT.GOV,
████████████@PTT.GOV,
████████████@PTT.GOV,
████████████@PTT.GOV,
████████████@PTT.GOV, AND
AND TEN ELECTRONIC DEVICES
CURRENTLY LOCATED AT THE FBI
WASHINGTON FIELD OFFICE, 601 4TH
STREET NW, WASHINGTON, D.C. 20535

Case: 1:17-mj-00686
Assigned To : Howell, Beryl A.
Assign. Date : 9/26/2017
Description: Search & Seizure Warrant

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, ████████████ , being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.       I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property –

namely, the email accounts and electronic devices described in Attachment A – currently in the

possession of the Federal Bureau of Investigation (FBI), and the extraction from that property of

electronically stored information described in Attachment B.

2.       I am a Special Agent with the FBI and assigned to the Washington Field Office.  I

am a law enforcement officer within the meaning of Section 2510(7) of Title 18, United States

Code, and I am authorized by law to conduct investigations and make arrests for felony offenses.

I have been a Special Agent with the FBI since November 1999.  I have conducted numerous

investigations involving both Criminal and National Security matters to include Espionage,

Counterterrorism, Drug Trafficking, and non-Traditional Organized Crime.  Prior to my position

as a Special Agent with the FBI, I was an Intelligence Officer with the Defense Intelligence Agency in Washington, D.C.

  3.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

  4.  This application seeks to search information contained in and associated with email accounts ████████████ @PTT.GOV, ████████████████ @PTT.GOV, ████████████ @PTT.GOV, ████████████████ @PTT.GOV and ████████████████ @PTT.GOV (the "**Transition Team Email Accounts**"); cellular telephones with serial numbers ████████████████████████████ ████████████████████████████████████████ ; and laptop computers with Dell "service tag" numbers ████████████████████████ (collectively, the "**Subject Devices**").

  5.  As described below, each of the **Transition Team Email Accounts** and **Subject Devices** was provided by the General Services Administration ("GSA") to one of five members of then-President Elect Donald J. Trump's transition team (the "Transition Team") as part of the 2016 presidential election, each of whose names are included in the email account assigned to him or her: Keith Kellogg, Sarah M. Flaherty, Sean M. Spicer, Reince R. Priebus, and Jared C. Kushner.  At the FBI's request, the GSA provided the **Transition Team Email Accounts** and **Subject Devices** to the FBI, which is maintaining them at the FBI's Washington Field Office located at 601 4th Street NW, Washington, D.C., 20535.  While the FBI might already have all

2

necessary authority to examine the property, see paragraph 21, infra, I seek this warrant out of an abundance of caution.  Because the property to be searched is located in the District of Columbia, this Court has jurisdiction to issue a search and seizure warrant. *See* Fed. R. Crim. P. 41(b)(1).

## PROBABLE CAUSE

6.      On August 25, 2017, the Honorable James E. Boasberg authorized the search of email accounts and electronic devices provided to three members of the Transition Team: MICHAEL T. FLYNN, Kathleen T. ("K.T.") McFarland, and ██████████. *See* 1:17-mj-00633.

7.      I have reviewed the emails obtained via the search warrant described above, some of which are summarized herein. In describing those communications in the below paragraphs, I have designated those instances in which a communication involved one of the Transition Team accounts for which this warrant applies (the "Subject Accounts"). For those instances in which a communication was sent to multiple email addresses, including both the Subject Account(s) as well as other account(s) which are not the subject of this warrant, I have designated the non-subject account simply by providing the name of the recipient.

### Relevant Individuals

8.      According to public source information, MICHAEL T. FLYNN was the Director of the Defense Intelligence Agency from July 2012 to August 2014.  In 2015, FLYNN started the Flynn Intel Group ("FIG"), and was its Chief Executive Officer and Chairman.  FLYNN was a surrogate for Donald J. Trump's 2016 presidential campaign (the "Campaign").  Following the election, on November 18, 2016, FLYNN accepted then-President Elect Donald J. Trump's offer to become National Security Advisor and he assumed that role on Inauguration Day, January 20,

2017.  In the interim, FLYNN served on the Transition Team.  On February 13, 2017, FLYNN resigned as National Security Advisor.  FLYNN currently resides in the United States and has maintained U.S. citizenship during the time period covered by this search warrant application (November 2016 to the present).

9.      Based on public source information and records obtained in the course of the investigation, K.T. McFarland was a national security analyst for Fox News during the campaign.  Following the campaign, on or about November 25, 2016, McFarland was announced as the appointee for Deputy National Security Advisor.

10.     Based on public source information and records obtained in the course of the investigation, Keith Kellogg was a retired Army General who advised the Trump campaign on foreign policy and national security matters.  Following the campaign, Kellogg was on the Department of Defense and National Security Council "landing teams," i.e., the Transition Team groups assigned to manage the transition for those particular agencies.  On or about December 15, 2016, Kellogg was announced as the appointee for Chief of Staff and Executive Secretary of the National Security Council, and he assumed that role on Inauguration Day.

11.     Based on public source information and records obtained in the course of the investigation, Sarah M. Flaherty was a U.S. Navy Lieutenant Commander during the campaign. Following the campaign, Flaherty served on the Transition Team; she was detailed from the Department of Defense to the National Security landing team and served as an Executive Assistant to the Deputy National Security Advisor Designate.

12.     Based on public source information and records obtained in the course of the investigation, Sean M. Spicer was the Republican National Committee Communications Director and Chief Strategist during the campaign. Following the campaign, Spicer served on the White

House landing team and on or about December 22, 2016, he was announced as the appointee for White House Press Secretary, a role he assumed on Inauguration Day.  Spicer resigned as Press Secretary on or about July 21, 2017.

13.     Based on public source information and records obtained in the course of the investigation, Reince R. Priebus was the Republican Party Chairman during the Trump campaign.  Following the campaign, Priebus served on the Transition Team and on or around November 14, 2016, Priebus was announced as the appointee for White House Chief of Staff, a role he assumed on Inauguration Day.  Priebus resigned as Chief of Staff on July 28, 2017.

14.     Based on public source information and records obtained in the course of the investigation, Jared Kushner is the son-in-law of President Trump and advised the TrumpCampaign.  As part of that role, he was asked to put together a blueprint for a transition team.  During both the campaign and the transition, Kushner served as the primary liaison to foreign governments.  On or around January 9, 2017, Kushner was announced as an appointee for White House senior advisor, a role he assumed on Inauguration Day and in which he continues to serve.

15.     Based on public source information and records obtained in the course of the investigation, Steve Bannon was the Trump campaign's Chief Executive.  He was also the former executive chair of Breitbart News.  Following the campaign, on or about November 14, 2016, Bannon was announced as White House chief strategist and senior counselor, a role he assumed on Inauguration Day. Bannon resigned from that role on or about August 18, 2017.

16.     Based on public source information and records obtained in the course of the investigation, Thomas Bossert was a fellow at the Atlantic Council's Cyber Statecraft Initiative. Following the campaign, Bossert was assigned to the National Security landing team.  On or

about December 27, 2016, Bossert was announced as the appointee for Homeland Security Advisor to the White House, a role he assumed on Inauguration Day and in which he continues to serve.

## The Subject Email Accounts and Subject Devices

17.     Based on communications with and records obtained from the General Services Administration, I know that as part of the 2016 presidential election, the GSA issued cellular telephones, laptop computers, and email accounts to members of the President-Elect's Transition Team for use during the period of the transition, which lasted from on or about the day after the election, November 9, 2016, until on or about the date of the inauguration, January 20, 2017.

18.     Based on information provided by the GSA, I have learned that the GSA provided the Transition Team with a variety of tools from Google, to include Google Email and Google Drive, which allowed members of the Transition Team to transmit and store emails and create and download files, such as presentations, spreadsheets, and other types of documents.

19.     Based on information provided by the GSA, Keith Kellogg was assigned the email address ████████████@PTT.GOV, Sarah Flaherty was assigned ████████████████@PTT.GOV, Sean Spicer was assigned ████████████@PTT.GOV, Reince Priebus was assigned ████████████████@PTT.GOV, and Jared Kushner was assigned ████████████@PTT.GOV.

20.     Based on information by the GSA, Keith Kellogg, Sarah Flaherty, Sean Spicer, Reince Priebus and Jared Kushner were assigned the following cellular phones and Dell laptop computers (the **Subject Devices**):

     a.   <u>Keith Kellogg</u>: Laptop # ████ 2; Phone Serial # ████████████

     b.   <u>Sarah Flaherty</u>: Laptop # ██████ Phone Serial # ██████████

c.  Sean Spicer: Phone Serial # ███████████████ and # █████████████

d.  Reince Priebus: Laptop # ███████████; Phone Serial # ████████████████

e.  Jared Kushner: Laptop # ████████████; Phone Serial # ██████████████

21.     Based on information provided by the GSA, when email accounts and devices

including the **Transition Team Email Accounts** and **Subject Devices** were issued to members

of the Transition Team, recipients were required to certify that the "Government property" they

had received was being provided "in connection with [their] role with the President-elect/Eligible

Candidate Transition Team"; that it needed to be returned when they were no longer working for

the Transition Team; and that they agreed to abide by the IT Acceptable Use Policy.  In addition,

the laptop computers issued by GSA to members of the Transition Team included a visible

banner upon turning on the computers that stated: "This is a U.S. General Services

Administration Federal Government computer system that is FOR OFFICIAL USE ONLY.  By

accessing and using this computer you are agreeing to abide by the PTT [Presidential Transition

Team] General IT Rules and Behavior and are consenting to monitoring, recording, auditing and

information retrieval for law enforcement and other purposes.  Therefore, no expectation of

privacy is to be assumed."  (emphasis added)

**The Investigation**

22.     The FBI is investigating whether FLYNN corresponded with foreign government

officials without the authority of the United States, with intent to influence the conduct of foreign

governments, in violation of 18 U.S.C § 953, and whether FLYNN made materially false

statements and omitted material facts to the FBI regarding his communications with those

foreign government officials, in violation of 18 U.S.C. § 1001.  The investigation thus far has

revealed that there is probable cause to believe that FLYNN had contacts with, *inter alia*,

Russian government officials when he was a member of the Transition Team of President-Elect Donald J. Trump that may have violated 18 U.S.C. § 953 and that there is probable cause to believe that he lied to FBI agents about those contacts, in violation of 18 U.S.C. § 1001.  There is also probable cause to believe that evidence of FLYNN's crimes is contained within or on the Subject Email Adresses and Subject Devices, as set forth below.

### A.   Transition Team Protocol For Foreign Government Officials

23.    According to witness interviews and records reviewed during the course of the investigation, members of the Transition Team were advised that it would be improper for them to engage with foreign governments about foreign policy until after President Trump was inaugurated.  For example, on or about November 30, 2016, ▮▮▮▮▮▮▮, the National Security Council transition staff member responsible for arranging meetings and onboarding personnel, emailed FLYNN that she needed his guidance because "NYC Presidential Elect staff are saying there should be no foreign national engagements until after the inauguration," but FLYNN and his deputy, McFarland, were "getting large number [sic] of requests for foreign national meetings."  ▮▮▮▮ further advised FLYNN that the State Department "landing team said they are declining all meeting [sic] for VP Elect [i.e., Vice-President Elect Michael Pence]," or limiting the duration of such meetings, because of the fear that the meeting would "involve a discussion of policy, or worse, be leaked to the press by visiting dignitaries."

24.    According to Transition Team records, all "senior-level meeting requests" from embassies, foreign ministries, and third parties would "be noted for the review of Rick Dearborn, Jared Kushner and Reince Priebus."  If those individuals approved the request, they would "assign the appropriate individuals the responsibility for engagement."  In addition, embassy

meeting requests in particular were to be the responsibility of FLYNN and McFarland until President-Elect Trump selected a Secretary of State.

### B.     FLYNN's Interactions with Foreign Government Officials

#### 1.     FLYNN's Relationship with the Russian Ambassador

25.    According to witness interviews and records obtained during the course of the investigation, FLYNN had met and interacted with the Russian Ambassador to the U.S., Sergey Kislyak ("Ambassador Kislyak"), from at least December 2015 onwards.

26.    On or about November 30, 2016, FLYNN and Jared Kushner met with Ambassador Kislyak at Trump Tower.  FLYNN described the meeting to the FBI as having been "relatively sensitive."

27.    On or about December 6, 2016, an individual working at the Russian Embassy emailed the personal assistant of Jared Kushner seeking to arrange a meeting between the Russian Ambassador to the U.S. and Kushner to follow up on the discussion held on November 30th.  The Embassy official also asked Kushner's assistant to provide him with the contact information for FLYNN and to ask FLYNN to call the Russian Ambassador at either his home number or his cell phone number.  Kushner's assistant forwarded the email chain to FLYNN's Chief of Staff, cc'ing FLYNN himself, and wrote "Please see the correspondence below and ensure Lt. General Flynn gets in contact with Russian Ambassador Sergey via phone."  Marshall Billingslea, a National Security Council landing team staff member, wrote to FLYNN and his staff that he "strongly recommend[ed] this proposed discussion with the Russian ambassador be postponed until after inauguration.  Russian ambassador is not of an equivalent rank for either of our principals."  McFarland replied, "Let [General] Flynn make this decision.  Russian amb[assador] historically does meet with nsc [National Security Council] head.  Their

amb[assador] to USA and to UN is of a very high rank with close relations to Putin.  Plus [General] Flynn has met with him in past."

## 2.  The UN Security Council Resolution

28.     According to public news reports, on or about the evening of the December 21, 2016, Egypt presented to the United Nations ("UN") Security Council a draft resolution condemning Israeli settlements in the West Bank and East Jerusalem. The UN Security Council was scheduled to hold a vote on the resolution in the afternoon of December 22, 2016.

29.     According to records obtained during the course of the investigation, on or about December 22, 2016, at approximately 6:02 a.m., a senior advisor to a Republican Senator wrote to McFarland, cc'ing FLYNN; Sarah M. Flaherty; Keith Kellogg, at his transition team account; and others, that the United Nations Security Council was "voting to condemn the Israeli settlements at 10 a.m." and that there had been no public response from officials within the Obama Administration.

30.     According to records obtained during the course of the investigation, at approximately 8:46 a.m. on December 22, 2016, FLYNN had a four-minute conversation with Jared Kushner.  After that conversation concluded, at approximately 8:53 a.m., FLYNN called the Russian Ambassador to the U.S.  FLYNN then called a representative of the Egyptian government and had a four-minute conversation with him.  At approximately 8:59 a.m., FLYNN had a three-minute conversation with the Russian Ambassador.  Over the next few hours, FLYNN had several additional phone calls with the representative of the Egyptian government.

31.     According to public news reports, in the late morning of December 22, 2016, Egypt's UN mission postponed the UN Security Council vote on the draft resolution demanding an end to Israeli settlements. According to records obtained during the course of the

investigation, at approximately 10:28 a.m. on December 22, 2016, the senior advisor to a

Republican Senator mentioned above wrote the following to FLYNN; KT McFarland; Keith

Kellogg, at his transition team account; Sarah Flaherty and others: "Looks like Egypt may

postpone the vote. If so, mission accomplished!" Also, at approximately 1:58 p.m. on

December 22, 2016, McFarland emailed ███████████, cc'ing ██████████, Sean Spicer,

Steve Bannon, FLYNN, Reince Priebus, and Jared Kushner. McFarland wrote "Looks like [a]

win for the good guys. Thanks to all for jumping right on this. Trumps (i.e. Your) quick reaction

is likely to have made a difference with [the] Egyptians."

32.     According to records obtained during the course of the investigation, at

approximately 3:39 p.m. on December 22, 2016, FLYNN emailed ██████████ and Sean Spicer,

cc'ing Steve Bannon; Reince Priebus; Jared Kushner; Keith Kellogg, at his transition team

account; McFarland; and others a draft statement written by Egyptian government officials

summarizing a call between the President of Egypt and President-Elect Trump that occurred later

that day. FLYNN wrote, "here is the Egyptian's [sic] statement they plan on putting out post the

phone call with PET [i.e., President Elect Trump] today." The draft statement noted that

President-Elect Trump and President Sisi of Egypt "agreed to lay the groundwork for the new

Administration to drive the establishment of a true peace between the Arabs and the Israelis."

Kushner replied all to that email and wrote: "Can we make it clear that Al Sisi reached out to

DJT [i.e., Donald J. Trump] so it doesn't look like we reached out to intercede? This happens to

be the true fact pattern and better for this to be out there."

33.     At approximately 8:26 p.m. on December 22, 2016, K.T. McFarland emailed

FLYNN and Sarah Flaherty and stated that FLYNN had "worked it all day with trump from

Mara lago." According to email and phone records, FLYNN was at President-Elect Trump's

Mar-a-Lago resort in Palm Beach, Florida, from approximately December 20 through December 22, 2016.

34.     At approximately 7:20 a.m. on December 23, 2016, FLYNN emailed ███████;
███████; McFarland; Keith Kellogg, at his transition team account; ███████; Reince Priebus; Jared Kushner; Sean Spicer; and Steve Bannon. FLYNN stated "This is for background only, but believe we all need to have this info:…I have spoken to France (they will likely follow the US[, b]ut my counterpart told me they are generally in favor). I spoke to the Russian AMBO to US and he acknowledged but did not give any insight—they are likely to vote yes, but could abstain."

35.     At approximately 9:49 a.m. on December 23, 2016, Jared Kushner called FLYNN. FLYNN attempted to return his call twice, and at approximately 10:21 a.m., Kushner again called FLYNN and the two spoke for approximately four minutes. Then, at approximately 10:47 a.m., FLYNN called the Russian Ambassador; approximately an hour later, he called a representative of the Egyptian government; and then he had contact with a number associated with the Russian Embassy at approximately 12:14 p.m.

36.     According to public news reports, in the late morning of December 23, 2016, Malaysia, New Zealand, Senegal, and Venezuela proposed again the withdrawn Egyptian-drafted resolution. This resolution, United Nations Security Council Resolution 2334, was passed in a 14-0 vote with the fifteenth Security Council member, the United States, abstaining. At approximately 12:14 pm, Donald Trump tweeted, "As to the U.N., things will be different after Jan. 20th."

37.     At approximately 4:01 pm on December 23, 2016, McFarland emailed FLYNN, copying Keith Kellogg, at his transition team account, Sarah M. Flaherty, at her transition team

account, and others, writing: "Mike maybe someone could talk to a friendly reporter on

background about the crucial role you played in working your contacts built up over the decades

to get [the Obama] administration ambush [of] Israel headed off. You worked the phones with

Japanese Russians Egyptians Spanish etc and reversed a sure defeat for Israel by

kerry/Obama/susan rice/samanatha power cabal." Based upon my training, experience, and

knowledge of this investigation, I believe McFarland was suggesting that FLYNN inform the

press, on background, about his successful efforts to convince Egypt to withdraw or delay voting

on the UN Security Council resolution.

38.      On or about January 24, 2017, FLYNN was interviewed by the FBI (the "January

FBI Interview"). During that interview, FLYNN recounted some of his interactions with foreign

governments pertaining to the December 2016 UN Security Council Resolution. FLYNN told

the interviewing agents that he did not ask Russian Ambassador Kisklyak or the representatives

of any of the other countries he contacted to vote in a particular way or to take any action. He

added that he did not believe his outreach to the various countries would change anything, and

that he did not ask them to take any particular stand; he stated that the purpose of his calls to the

various foreign governments was simply to ascertain what their position was on the vote, and not

to influence it.

### 3.      The Russian Sanctions Announcement

39.      On or about December 19, 2016, the Russian Ambssador to Turkey was killed.

During the January FBI Interview, FLYNN told the interviewing agents that he had called

Ambassador Kisylak the following day to express his condolences. At approximately 8:51 a.m.

on December 20, 2016, FLYNN made a call to a number associated with the Russian Embassy –

the call lasted approximately one minute and thirty seconds. On or about December 25, 2016, a

Russian military plane crashed into the Black Sea on its way to Syria and everyone on board was killed. During the January FBI Interview, FLYNN told the interviewing agents that he called the Russian Ambassador around the time of the plane crash to express his condolences.

40.     Based on travel, phone, and bank records, I know that from on or about December 25, 2016, to on or about December 30, 2016, FLYNN was in the Dominican Republic. For example, statements for a Merrill Lynch account held in the name of MICHAEL T. FLYNN and ▮▮▮▮▮▮▮▮▮▮ included transaction activity associated with a "Visa Access" card. On or around December 26, 2016, and again on or around December 30, 2016, charges were incurred on this card with a description including a reference to "Inversiones El Laurel," which is a hotel and resort in the Dominican Republic.

41.     Based upon witness interviews and other records obtained during the course of the investigation, I am aware K.T. McFarland, Bannon, and Priebus were staying at the Mar-a-Lago resort in Palm Beach, Florida with President Elect-Trump on or about December 29, 2016.

42.     Based on a review of open source material, on December 28, 2016, then-President Barack Obama signed Executive Order 13757, which was to take effect on December 29, 2016, at 12:01 a.m. Executive Order 13757 announced sanctions against the Russian government in response to the Russian government's efforts to interfere with the 2016 presidential election. At approximately 11:24 a.m., the Obama administration, using Twitter handle @ObamaWhiteHouse, posted a link to a statement by then-President Obama titled, "Statement by the President on Actions in Response to Russian Malicious Cyber Activity and Harassment." The announcement stated that the sanctions were in retaliation for "Significant Malicious Cyber-Enabled Activities" engaged in by Russia during the presidential election, and imposed economic sanctions on four Russian individuals and five Russian entities. The administration

also ordered 35 Russian diplomats to leave the country and the closure of two Russian compounds in the Washington, D.C. area.  The sanctions initially prompted vows from the Russian government that it would respond in kind, as described in more detail below.

43.     Based on records obtained during the course of the investigation, I am aware that on December 29, 2016, McFarland had multiple phone calls with FLYNN. At approximately 2:29 p.m., McFarland, using her GSA-issued cellular telephone, called FLYNN's personal cell phone.  McFarland again called FLYNN at approximately 3:50 p.m., and the call lasted for approximately six minutes and thirty-nine seconds.  Minutes after that call, at approximately 4:01 p.m., the telephone number          , which was subscribed to by "Inversiones El Laurel," with a "site address" of "Excellence Punta Cana Resort" in the Dominican Republic, called McFarland for approximately 11 minutes.

44.     At approximately 4:01 p.m. on December 29, 2016,          emailed FLYNN; McFarland; Steve Bannon; Keith Kellogg, at his transition team account; and Reince Priebus, at his transition team account, stating: "…[The Obama White House's Homeland Security Advisor] confirms the Russiand have already responded with strong threats, promising to retaliate. [She] characterized the Russian response as bellicose. My thoughts, sans the Russia angle, on which I defer to Mike and KT:      : Cyber attacks by forcing governments or anyone else are unacceptable and must be taken seriously. The alleged Russian hack of US entities involved in the US political process is a problem. Of course we must separate their attempts to influence our election from the rash conclusion that they succeeded in altering the views of any American voter. We must be wary of escalatory realiation to follow."

45.     At approximately 4:43 p.m. on December 29, 2016, McFarland emailed FLYNN; Keith Kellogg, at his transition team account; Sarah M. Flaherty, at her transition team account;

Sean Spicer, at his transition team account; Reince Priebus, at his transition team account; Steve Bannon; and ▇▇▇▇▇▇▇ her concerns that the U.S. sanctions would make it difficult for "[T]rump" to "improv[e] relations with Russia." McFarland also informs that group that FLYNN is "talking to the russian ambassador this evening." Based upon my training, experience, and knowledge of this investigation, I believe McFarland's phone calls with FLYNN before sending this email, her discussion of the U.S. sanctions imposed that day, and her reference to FLYNN speaking with the Russian Ambassador indicate that FLYNN and McFarland discussed the U.S. sanctions imposed against Russia when they spoke over the phone.

46.     At approximately 4:20 p.m., the Excellence Resort telephone number ▇▇▇▇▇▇ ▇▇▇▇ was in contact, for approximately 11 minutes, with a phone number that I am aware, based on publicly-available sources, belongs to the Russian Embassy in Washington, D.C. On or about January 14, 2017, incoming White House Press Secretary Sean Spicer confirmed publicly that FLYNN had spoken to Russian Ambassador Kisklyak by telephone on December 29, 2016.

47.     During the January FBI Interview, FLYNN told the interviewing agents that he did not recall having any conversation with Ambassador Kislyak surrounding the expulsion of Russian diplomats or the closing of Russian properties.

48.     On December 30, 2016, at approximately 5:32 a.m., a statement was released by Sergey Lavrov, the Russian Foreign Minister, on the mid.ru website, which is a website used by the Ministry of Foreign Affairs of the Russian Federation for the release of public statements. Lavrov stated that in response to the sanctions imposed the previous day by the Obama administration, "We will definitely respond to these actions. Reciprocity is a basic tenet of international diplomacy and international relations. Therefore, the Russian Foreign Ministry and colleagues from other agencies have submitted a proposal to the President of Russia to declare

'persona non grata' 31 diplomats from the US Embassy in Moscow and four diplomats from the US Consulate General in St Petersburg."

49.     On December 30, 2016, at approximately 7:15 a.m., a statement was released by Vladimir Putin, the President of Russia, on the kremlin.ru website, which is a website used by Putin for the release of public statements.  In response to the sanctions imposed by the Obama administration, Putin said Russia would not in fact expel U.S. diplomats in response to the U.S. sanctions, and stated: "Leaving the right for retaliatory measures, we will not go down to the level of 'kitchen,' irresponsible diplomacy and further steps for restoring Russian-American relations will be built on the basis of the policy that Presidential Administration D. Trump will conduct."

50.     At approximately 8 a.m. on December 30, 2016, McFarland emailed FLYNN; Keith Kellogg, at his transition team account; Sean Spicer, at his transition team account; Reince Priebus, at his transition team account; Steve Bannon, at his transition team account; and others about the Russian decision not to retaliate against the U.S. in response to the sanctions. McFarland commented:  "My take is Russians are taking the most restrained retaliation possible – it's his Signal [sic] to trump that he wants to improve relations once obama leaves.  Although [Obama] didn't mean to he has given [Trump] new leverage over Putin.  So far so good."   At approximately 10:50 a.m. on December 30, 2016, McFarland emailed FLYNN; Keith Kellogg, at his transition team account; Jared Kushner; Reince Priebus; Sean Spicer and others that the statement by former Russian President Dmitry Medvedev "plus Putin response to NOT match obama tit for tat are signals they want a new relationship starting jan 20.  They are sending us a signal."

51.     On December 30, 2016, at approximately 11:41 a.m., President-Elect Donald

Trump tweeted: "Great move on delay (by V. Putin) - I always knew he was very smart!"

52.     At approximately 12:02 pm on December 30, 2016, McFarland  emailed FLYNN,

Keith Kellogg, at his transition team account; Sarah M. Flaherty, at her transition team account;

Reince Priebus, at his transition team account; Jared Kushner, at his transition team account;

Steve Bannon, at his transition team account; and others a summary of FLYNN's conversation

the day before with the Russian "AMBO," which I believe to be shorthand for "Ambassador."

McFarland appears to recite a summary of information she received from FLYNN in this email;

she provides a summary of FLYNN's conversation with the Russian Ambassador, but does not

indicate that they discussed the sanctions imposed against Russia that had been announced

earlier that day.

53.     According to toll records, on December 31, 2016, at approximately 2:14 p.m.,

FLYNN received a call on his personal cell phone, approximately 5 minutes in duration, from a

phone number subscribed to by the Russian Embassy in Washington, D.C.  Also on December

31, 2016, at approximately 4:43 p.m. on December 31, 2016, FLYNN spoke by phone with

McFarland; subsequently, FLYNN and McFarland exchanged several text messages. FLYNN

also exchanged phone calls with Priebus and Bannon.

54.     On or about January 12, 2017, David Ignatius published an article in the

Washington Post alleging that FLYNN called Russian Ambassador Kislyak several times on

December 29, 2016, and pondering the question of whether FLYNN said anything to Kislyak to

undermine the U.S. sanctions.

55.     At approximately 8:16 p.m. on January 12, 2017, in response to learning about the

Washington Post article, FLYNN emailed McFarland; Keith Kellogg, at his transition team

account; Sarah M. Flaherty, at her transition team account; Sean Spicer; and others about his call with the Russian Ambassador. In the email, FLYNN indicated that they did not talk about the sanctions.

56.     According to one transition team official who discussed the David Ignatius article with FLYNN approximately the day after it was published, FLYNN indicated that the story was "fake news," and that he had called Ambassador Kislyak to wish him a Merry Christmas and to express his condolences for the Russian military plane crash that occurred on December 25, 2016.

57.     At approximately 10:30 a.m. on January 14, 2017, FLYNN wrote the following to Sean Spicer, at his transition team account, cc'ing KT McFarland; Keith Kellogg, at his transition team account; Steve Bannon and others: "Sean, Per our discussion this morning.  This article is BS.  I had one call . . . . FYI, I was on a four day vacation in the DOMREP [Dominican Republic] w[ith] my wife at the time and was not that available, trust me."

58.     Based on a review of open source material, on January 15, 2017, Vice President-Elect Mike Pence appeared on CBS's Face the Nation.  During the interview, Pence was asked whether FLYNN had been "in touch with the Russian ambassador on the day the United States government announced sanctions for Russian interference with the election [December 29, 2016]."  Pence stated that he had "talked to General Flynn about that conversation" and that FLYNN and Russian Ambassador Kislyak "did not discuss anything having to do with the United States' decision to expel diplomats or impose censure against Russian."  PENCE was then asked: "So did they [FLYNN and Kislyak] ever have a conversation about sanctions ever on those days or any other day?"  Pence responded: "… I can confirm, having spoken to him

[FLYNN] about it, is that those conversations that happened to occur around the time that the United States took action to expel diplomats had nothing whatsoever to do with those sanctions."

59.     Based on a review of open source material, on February 13, 2017, FLYNN resigned as National Security Advisor.  In his letter of resignation, FLYNN stated: "I inadvertently briefed the Vice President Elect and others with incomplete information regarding my phone calls with the Russian Ambassador."

60.     Based on a review of open source material, on February 14, 2017, Press Secretary Sean Spicer held a regularly scheduled press briefing.  At the briefing, Spicer stated: "I want to address the events of last night first and foremost.  We've been reviewing and evaluating this issue with respect to General Flynn on a daily basis for a few weeks, trying to ascertain the truth. We got to a point not based on a legal issue, but based on a trust issue, where a level of trust between the President and General Flynn had eroded to the point where he felt he had to make a change.  The President was very concerned that General Flynn had misled the Vice President and others."

61.     Based on a review of open source material, on February 16, 2017, President Trump held a press conference during which he stated: "Mike Flynn is a fine person, and I asked for his resignation.  He respectfully gave it.  He is a man who there was a certain amount of information given to Vice President Pence, who is with us today.  And I was not happy with the way that information was given.  He didn't have to do that, because what he did wasn't wrong – what he did in terms of the information he saw."  In response to a subsequent question, President Trump further stated: "[FLYNN] didn't tell the vice president of the United States the facts.  And then he didn't remember.  And that just wasn't acceptable to me."

62.     On May 8, 2017, Sally Yates, who was the Acting Attorney General from approximately January 20, 2017, until January 30, 2017, testified before the Senate Judiciary Subcommittee on Crime and Terrorism.  During her testimony, Yates stated that she had met with White House Counsel Don McGahn on January 26 and January 27, 2017 to discuss "a very sensitive matter," and that she began her meeting with McGahn by "telling him that there had been press accounts of statements from the vice president and others that related conduct that Mr. Flynn had been involved in that we knew not to be the truth."

63.     Based on a review of open source material, on February 20, 2017, Vice President Pence told reporters at a joint news conference with the head of the North Atlantic Treaty Organization in Brussels, "I was disappointed to learn that the facts that had been conveyed to me by General Flynn were inaccurate."

### Electronic Storage and Forensic Analysis

64.     I know based on my training and experience that a wireless or cellular telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the

Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

65.     Based on my knowledge, training and experience, I know that when a user accesses his or her email account from a device such as a cellular telephone or a laptop computer, records of the contents of that email account are likely to be stored on that cellular telephone or laptop computer.

66.     Based on my knowledge, training and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

67.     Information provided by the GSA indicates that some of the **Subject Devices** were "wiped" after they were returned to the GSA following the transition period. Nevertheless, based on my knowledge, training, and experience, there is probable cause to believe that things that were once stored on the **Subject Devices** may still be there, or may be recoverable, for at least the following reasons:

    a.  Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overridden by new data.

b. Therefore, deleted files or remnants of deleted files may reside in free space or slack space – that is, space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

68. Manner of execution.  Because this warrant seeks only permission to examine accounts and devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

69. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Transition Team Email Accounts** and **Subject Devices**, identified in Attachment A, to seek the items described in Attachment B.

## REQUEST FOR SEALING

70.     I further request that the Court order that all papers in support of this application, including the application, affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,



Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 27th day of September, 2017.

The Honorable Beryl A. Howell
Chief United States District Judge

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information, including emails, attachments, documents, and files

stored within Google Email and Google Drive, contained in or associated with the following

accounts and property, which are in the possession of the FBI:

I.    **Transition Team Email Accounts**
   1.  Transition team accounts provided by the GSA with account names:
       a.                   @PTT.GOV,
       b.                   @PTT.GOV,
       c.                @PTT.GOV,
       d.                   @PTT.GOV,
       e.                   @PTT.GOV

II.   **Subject Devices**
   2.  Cellular telephones provided by GSA with serial numbers:
       a.                   (assigned to Keith Kellogg)
       b.                   (assigned to Sarah Flaherty)
       c.                   (assigned to Sean Spicer)
       d.                   (assigned to Sean Spicer)
       e.                   (assigned to Reince Priebus)
       f.                   (assigned to Jared Kushner)

   3.  Laptop computers provided by GSA with Dell laptop service tag numbers:
       a.                (assigned to Keith Kellogg)
       b.               (assigned to Sarah Flaherty)
       c.                (assigned to Reince Priebus)
       d.                (assigned to Jared Kushner)

## ATTACHMENT B

### Information to be Seized

Any and all records in the **Transition Team Email Accounts** and **Subject Devices** (described in Attachment A) which consist of evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 953 (private correspondence with foreign governments) and/or 18 U.S.C. § 1001 (making a false statement), for the period November 2016 to the present, including:

a.      All communications, records, information, documents, presentations, spreadsheets, or tangible materials that relate in any way to communications with foreign government officials or agents of a foreign power, or discussions with others regarding those actions, or plans or attempts at undertaking such actions;

b.      All communications, records, information, documents, presentations, spreadsheets, or tangible materials that relate in any way to meetings with the FBI or investigations being conducted by the FBI;

c.      All communications, records, information, documents, presentations, spreadsheets, or tangible materials that relate in any way to providing false statements or false statements provided to persons working for the government;

d.      All images, messages, communications, calendar entries, search terms, and contacts, including any and all preparatory steps taken in furtherance of the above-listed offenses;

e.      Communication, information, documentation and records relating to who created, used, or communicated using any account on the devices or within the accounts, including records about their identities and whereabouts;

f.      Evidence of the times the accounts or devices were used;

g.      All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

h.      All address books or other lists of contacts;

i.      All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

j.      Passwords and encryption keys, and other access information that may be necessary to access the account and other associated accounts;

k.      Any information recording the schedule of or travel by Michael T. Flynn, Keith Kellogg, Sarah Flaherty, Sean Spicer, Reince Priebus, and Jared Kushner from June 16, 2015 to the present; and

1.      Evidence of user attribution showing who used the account or device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.